J-A24025-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF M.C.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: V.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 371 WDA 2020 |

Appeal from the Order Entered February 5, 2020
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-18-0254

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: V.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 372 WDA 2020 |

Appeal from the Order Dated February 5, 2020
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): No. 42-18-0255

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED DECEMBER 03, 2020**

V.H. ("Mother") appeals the order terminating her parental rights to M.S. and S.S. (collectively, "Children"). Mother argues the trial court erred in finding the evidence supported the involuntary termination of her rights. We affirm.

In December 2016, the trial court granted McKean County Children and Youth Services ("CYS") emergency custody of M.S., born December 2014. S.S.

was born in February 2018, and the court granted CYS's request for emergency custody the following month, in March 2018. In October 2018, CYS filed a petition for involuntary termination of Mother's parental rights as to both Children.

Mother and S.S. ("Father")[1] were in a volatile and abusive relationship. Police responded to the home of Mother and Father on numerous occasions for domestic disputes. N.T., 10/25/19, at 43. One such incident occurred in February 2017, when Mother went to the emergency room for a head injury, and informed the emergency room nurse that Father had hit her with a closed fist. Mother continued to be in a relationship with Father until at least May 2018, and there continued to be episodes of physical violence, including an incident in March 2018 that resulted in criminal charges being filed against both Mother and Father. *Id.* at 36-43; N.T., 7/26/19, at155.

Sometime after May 2018, Mother began a relationship with another individual. N.T., 1/17/20, at 21. At the time of the hearing on the petition to terminate, Mother resided with this individual and was expecting a child with him. *Id.* at 26-27. Neither Mother nor her boyfriend testified at the hearing, and the record contains little evidence regarding the boyfriend or the relationship.

---

[1] CYS filed a petition to terminate Father's parental rights, which the court granted. Father appealed, and we address his appeals at dockets 365 WDA 2020 and 366 WDA 2020.

- 2 -

Mother has not been consistent with visits with Children. She has at times regularly visited them, but, during other periods, her attendance at visits has been sporadic. ***See, e.g.*** N.T., 7/26/19, at 157-58; N.T., 10/25/19, at 69-70. Further, Mother has difficulty interacting with Children during visits. N.T., 10/25/19, at 78. When service providers are in the home, Mother follows their directives. ***Id.*** However, Mother has difficulty following through and implementing the skills taught by the providers when the providers are not there. A CYS case worker, Shaina Burgett, testified that she supervised 25 visits with Mother, and Mother canceled 14 other visits. N.T., 11/8/19, at 9. She testified that Mother was occupied on her phone during much of the visits. ***Id.*** at 10. She was "more hands on . . . when . . . the Nurse Educator . . . or Parents as Teachers were there and . . . once visits were moved to the office." ***Id.***

Testimony from numerous case workers established that Mother had difficulty with Children, and that Children were upset prior to the visits, and did not want to attend. ***See id.*** at 15 (M.S. would yell and cry when the case worker arrived to take him to visits); ***id.*** at 56 (Children would cry and not want to get into the car to go to visits); N.T., 1/17/20, at 40 (M.S. would hide and say he did not want to go to visits).

M.H. ("Foster Mother") testified regarding S.S.'s health issues. S.S. has had pneumonia five times, and was twice life-flighted to the Children's Hospital of Pittsburgh, in December 2018 and June 2019. N.T., 1/17/20, at 193. In December 2018, Foster Mother texted Mother about S.S.'s condition. ***Id.***

Mother did not arrive at the hospital until the following afternoon. *Id.* at 196. Although Mother remained at the hospital for the weekend, she spent most of her time on her cell phone. *Id.* at 197. Foster Mother also notified Mother of the June 2019 hospital stay, but Mother did not visit. *Id.* at 201. Foster Mother further testified that she, not Mother, rode the helicopter with S.S., and that she stepped in when medical providers were unable to place an I.V. in S.S.'s arm, insisting they wait for the helicopter, when more experienced professionals could assist. *Id.* at 249.

Mother's goals included obtaining mental health treatment. A therapist at The Guidance Center, Lennis Watkins, provided Mother with outpatient therapy, starting in January 2018. N.T., 7/26/19, at 9. He recommended Mother attend twice per week, but, over a 14-month period, she attended only 12 appointments. *Id.* at 9-10. Mother was discharged June 2019 due to non-attendance. *Id.* at 12.

An expert in clinical psychology and in bonding assessments, Dr. Peter von Korff, testified that M.S. does not accept Mother as a parental figure, and that his relationship with Mother is "insecure." *Id.* at 52. He testified that Mother expresses an interest in having a relationship with Children and providing care, but "is ineffective in following through." *Id.* at 50. M.S. struggles with visits with Mother, and M.S. was "very reluctant" and "slow and hesitant" to approach Mother. *Id.* at 48. Dr. von Korff testified that S.S. was not comfortable with Mother, and was eager to return to Foster Mother and D.H. ("Foster Father") (collectively "Foster Parents"). *Id.* at 56.

Dr. von Korff testified that, although it may be possible for Mother to form a "primary bond" with Children, he questioned whether that bond would be secure. *Id.* at 77. Dr. von Korff testified that it would be to Children's advantage to remain with Foster Parents, and Children would not suffer significant emotional harm if the court terminated Mother's rights. *Id.* at 71. He testified that although M.S. has a "tentative relationship with both [Parents], that his secure functioning is with the [Foster Parents], and that if severance takes place, that he will be able to rely on that secure functioning." *Id.* at 79.

The trial court terminated Mother's rights to Children, finding termination proper under Subsections 2511(a)(1), (2), (5), and (8), and Section 2511(b) of the Adoption Act. Mother filed a timely notice of appeal.

Mother raises the following issue: "Whether the trial court erred in finding that the evidence admitted at trial was sufficient to support an involuntary termination of parental rights?" Mother's Br. at 4.

When we review termination of parental rights cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We may reverse a trial court decision "for an abuse of discretion only upon

demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *See In re Adoption of K.C.*, 199 A.3d at 473. Clear and convincing evidence means evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section 2511, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*Id.* (citations omitted). To affirm, "we need only agree with [the trial court's] decision as to any one subsection" of 2511(a), as well as its decision as to Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, the trial court terminated Mother's parental rights pursuant to multiple subsections of Section 2511(a), including subsection (a)(1). That subsection provides:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1). "With respect to any petition filed pursuant to subsection (a)(1) . . . , the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

Subsection 2511(a)(1) requires the moving party to prove by clear and convincing evidence that the subject parent engaged in "conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Z.S.W.***, 946 A.2d 726, 730 (Pa.Super. 2008). The parental obligation is a "positive duty which requires affirmative performance" and "cannot be met by a merely passive interest in the development of the child." ***In re C.M.S.***, 832 A.2d 457, 462 (Pa.Super. 2003) (quoting ***In re Burns***, 379 A.2d 535, 540 (Pa. 1977)). Indeed,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship

- 7 -

to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

The trial court concluded CYS presented clear and convincing evidence of grounds for termination of parental rights under Section 2511(a)(1):

Parents are required to act affirmatively with good faith interest and effort to perform parental duties. Mother [has] not done that. . . .

Services have been provided for Mother and she has cooperated with providers. However, she has failed to retain and utilize proper parenting skills once the service providers are gone. Mother is easily distracted from parenting by her own life concerns and interests. She has missed many visits and had a problem focusing on her phone and not the children during visits. After she was ordered by the court to not use her cellphone during visits, Mother has had more interaction with the children during the visits. However, Mother still struggles with ascertaining the children's needs and interacting with them. She has great difficulty controlling behavior. After years of services and visits Mother still is not in a position to provide appropriate care for the children.

After the termination petition was filed Mother's life became more stable. She is residing with her current paramour at his residence. His home appears appropriate and he appears to motivate Mother to have visits and contact with the children. However, these recent developments occurred after the termination petition was filled. Therefore, their legal significance is limited. In addition, Mother and her paramour did not testify at the termination hearings. Therefore, there is limited evidence in the record to support the assertion that Mother's current relationship with her

paramour is stable; and, that it would be beneficial for the children to have extended contact with Mother's paramour. Very little is known about Mother's paramour.

What is known is that Mother has a very strained relationship with the children. M.S. does not benefit from visits with his Mother. He is greatly emotionally troubled by them. He agonizes and dreads the visits. He has gone so far as to insist that [Foster Parents] are his birth parents, insisting that they brought him home from the hospital. He recognizes the stability that he has with [Foster Parents] and the instability he has had regarding Parents. He desperately does not want to lose that stability.

S.S. has no connection to Parents as she has had limited contact with them; and, [Foster Parents] have provided care and support for her since she was born. There are numerous examples of the care and support [Foster Parents] have provided for both children in this record (and Parents' unavailability). One in particular demonstrates both the commitment [Foster Parents] have to the children and the children's recognition of [Foster Parents] as their parental figures. [Foster Mother] described S.S's first life flight[] to Pittsburgh. S.S. was in desperate need of an IV. It was required before she take the flight and needed as she was dehydrated. Parents were not at the hospital and S.S. was in [Foster Mother's] arms. The medical staff attempted, again and again, to stick a needle in her and find one of her tiny veins. S.S. would scream and squirm each time an attempt was made. [Foster Mother], looking out for S.S., said: "enough," telling the medical staff that the team on the helicopter had more experience inserting an IV in a young child and they needed to wait until they arrived. [Foster Mother] was the one there when the flight team arrived, when they grabbed S.S. and held her down while they inserted a needle in her to give her the IV. [Foster Mother] was the one that heard the bab[y]'s terrified screams and she was the one that comforted S.S. afterwards.

Regarding the statutory grounds for termination the court finds that CYS has established, by clear and convincing evidence, the following: For over twelve months . . . Mother . . . ha[s] been unable to provide safe and appropriate care for S.S. and ha[s] failed to make reasonable efforts towards

reunification. By [her] actions and [her] inaction [she has] demonstrated a settled purpose to relinquish and/or refuse to perform their parental duties. In addition, the cause of the Parents' inability to take any meaningful action is unlikely, even with the assistance of reasonable services or assistance, to be remedied in the future.

Trial Court Opinion ("1925(a) Op."), filed Feb. 5, 2020, at 12-14.

The court did not err as a matter of law or abuse its discretion. Mother's conduct prior to the filing of the termination petition, and sustained for at least six months before the filing, revealed a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. Mother did not consistently visit with Children, continued to have a relationship with Father, and did not follow through with her mental health treatment or other permanency goals.

We next must determine whether termination was proper under Section 2511(b). Under Section 2511(b), the court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the child's best interest. *See* 23 Pa.C.S.A. § 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. *In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa.Super. 2006). This analysis involves "[i]ntangibles such as love, comfort, security, and stability. . . ." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* Importantly, "[t]he mere existence of an emotional bond does not preclude the termination of parental rights." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super.

2011). Rather, the trial court "must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship." *Id.* (internal quotation marks and citation omitted). Further, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

The trial court concluded termination would best meet S.S. and M.S.'s developmental, physical, and emotional needs and welfare. The court found that both S.S. and M.S. know Foster Parents are there for them, good or bad, and M.S. had a negative bond with Mother, while S.S. had no bond with her:

> M.S. has a negative bond with Parents. He has already, despite what the court or others may say, concluded that [Foster Parents] are his parental figures and providers. It would be beneficial to M.S. to sever the negative bond he has with Parents and provide him with assurance that the stability he has experienced with [Foster Parents] will be permanent. It would be extremely traumatic to M.S. and S.S. to expand visits with Parents or place them in their care. S.S. has a strong bond with [Foster Parents] and no bond with Parents. Therefore, it best fulfills her needs and welfare to terminate parental rights and allow [Foster Parents] to adopt [S.S.] and M.S.

1925(a) Op. at 14.

The trial court did not err or abuse its discretion in finding termination would best meet Children's physical, social, and emotionally needs and welfare. The testimony at the hearing, including from Dr. von Korff, was that S.S. did not have a bond with Mother and M.S. had a negative bond. However,

Children had a positive bond with Foster Parents, to whom they look for love and support.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/3/2020